(No. 45302.

COMMUNITY CONSOLIDATED SCHOOL DISTRICT NUMBER 210 *et al.*, Appellees, v. JOE L. MINI, County Superintendent of Schools, *et al.*, Appellants.

*Opinion filed October 1, 1973.—Rehearing denied Nov. 28, 1973.*

RYAN, J., took no part.

GOLDENHERSH and KLUCZYNSKI, JJ., dissenting.

HUPP and IRION, of Ottawa (GEORGE C. HUPP, of counsel), for appellants.

JACK TRAGER, of Ottawa, for appellees.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

On April 14, 1969, defendant Joe L. Mini, the Superintendent of Schools for La Salle county, entered an order holding sufficient a petition requesting that an

election be called for the purpose of voting on the establishment of a community unit school district that would include territory within La Salle, Grundy and Kendall counties. The order found, *inter alia,* that the population of the proposed district was more than 1,750 persons but less than 4,000 and that additional action by the Superintendent of Public Instruction was necessary in order to call an election pursuant to section 11—6 of the School Code. Ill. Rev. Stat. 1967, ch. 122, par. 11—6.

Following entry of this order an action for administrative review was filed in the circuit court of La Salle County by Community Consolidated School District No. 210, its Board of Education, its Board president, and certain residents of the territory involved, all of whom had filed objections to the original petition. After a hearing, the circuit court of La Salle County ruled against the plaintiffs on all of their contentions, including those questioning the validity of section 11—6 of the school Code, and affirmed the order of the defendant Mini. The Appellate Court for the Third District reversed (5 Ill. App. 3d 807), and we allowed defendants' petition for leave to appeal.

The parties have briefed and argued this cause on issues relative to section 11—6 as it existed at the time of the events in question; we note, however, that section 11—6 has been substantially amended in the interval since review of defendant Mini's order was initiated and that no saving clause for pending district organizations was enacted. (See Laws of 1971, p. 1217; Laws of 1971, p. 1225; Laws of 1972, p. 1966; Laws of 1972, p. 2266, sec. 60.) This is similar to the factual situation in *Board of Education of Waverly Community Unit School District v. Nickell (1951), 410 Ill. 98,* in which amendments to the School Code completely revised the procedure for altering district boundaries without a saving clause for proceedings then pending on appeal. We there held that subsequent amendments were applicable to the proceedings then on review. (*Nickell,* at 103.) Accordingly, we now conclude

that no rights have vested under the old procedure for the creation of a community unit school district and that decision of this appeal is governed by the current statutory provision; we make no judgment on the constitutionality of section 11—6 as it existed from 1967 through 1969. See also *Dolan v. Whitney (1952), 413 Ill.2d 274.*

We turn then to an examination of section 11—6 as it presently exists. If that section provides a constitutionally valid procedure for the creation of community unit school districts in territories of this size, remandment of this cause to the regional superintendent is appropriate in order to enable him to determine whether the proceedings heretofore conducted comply with current statutory requirements.

In June of 1971 the General Assembly passed two separate acts, subsequently approved by the Governor, amending section 11—6 of the School Code. Public Act 77—598, passed on June 27, described four situations in which a community unit school district might be organized, the fourth being:

> "*** [A]ny contiguous and compact territory, no part of which is included within any community unit school district or other unit district, having a population of not less than 1500 and not more than 500,000 persons and an equalized assessed valuation of not less than $10,000,000 may be organized into a community unit school district as provided in this Article, if the special procedure later set forth in this Section for a district below 4,000 population is followed by the Superintendent of Public Instruction and the superintendent of an educational service region containing the greater percent of the assessed valuation of the proposed district than is contained in any other region in which assessed valuation of the proposed district is situated." Ill. Rev. Stat. 1971, ch. 122, par. 11—6.

An extended procedure was set forth with particularity for the petitions, hearings and elections necessary to the establishment of community unit school districts. Contained within this material was the following proviso:

"*** However, prior to calling any such election for organizing any such proposed district that does not have 4,000 or more population, the regional superintendent shall transmit to the Superintendent of Public Instruction a notice of the petition whereupon the Superintendent of Public Instruction shall prepare the notification or report indicating whether or not he deems it possible for the proposed district to provide a recognized school program for a 12-grade district under conditions set forth in that Section. The regional superintendent shall cause a copy of such report to be published as provided in that Section." Ill. Rev. Stat. 1971, ch. 122, par. 11—6.

The amendatory act made certain changes in section 11—6 not pertinent to this appeal.

Three days later, the legislature passed Public Act 77—604, also amending section 11—6 and differing from Public Act 77—598 in a number of respects. The second amendment continued in force the four situations in which a community unit school district might be organized, including the requirement set out above that a "special procedure" must be complied with for a district below 4,000 in population. In that portion establishing procedures for a hearing upon petitions for elections, however, two important changes are to be found. First, the regional superintendent could no longer grant such petitions in his own right, but was obliged to forward all those petitions which he had approved, together with any pertinent evidence, to the Superintendent of Public Instruction. Within thirty days, the Superintendent of Public Instruction was to grant or deny all such petitions, communicating his reasons to interested parties in the event of a denial. Should the petition be approved, the regional superintendent was to call an election on the petition. Succinctly stated, a procedure similar to that previously required only of districts below 4,000 in population, the so-called "special procedure", was made applicable to *all* petitioners seeking to establish a community unit school district.

Second, that language which described the former

"special procedure" for districts under 4,000 was specifically deleted from the section. Subsequent enactments have continued both the reference to a "special procedure" in the section's first paragraph and the deletion of the "special procedure" coupled with a revised "regular procedure" in the fourth paragraph. (See Laws of 1972, p. 1966; Laws of 1972, p. 2266, sec. 60.) If the General Assembly intended at the time of passage of Public Act 77—604 to retain a distinction in treatment between districts over 4,000 in population and districts under 4,000, but failed to provide the specific procedure to effectuate that intention, then the statute as passed and subsequently amended is unconstitutionally vague.

We believe, however, that the clear legislative intent manifested by the passage of Public Act 77—604 was to the contrary. That act specifically excised the language establishing a separate and distinct procedure for districts under 4,000 population; moreover, it made a modified version of the prior "special procedure" the standard to be followed on all petitions. It is apparent that the legislature considered review by the Superintendent of Public Instruction sufficiently beneficial to extend that requirement to the organization of all community unit school districts.

The law is clear that, if the main intent and purpose of the legislature can be determined from a statute, words may be modified, altered or even supplied so as to obviate any repugnancy or inconsistency with the legislative intention. (*People ex rel. Simpson v. Funkhouser (1944), 385 Ill. 396; Hirschfield v. Barrett (1968), 40 Ill.2d 224,* cert. denied, *393 U.S. 1062, 21 L. Ed. 2d 706, 89 S. Ct. 716; Carey v. Elrod (1971), 49 Ill.2d 464; People v. Clark (1972), 52 Ill.2d 374.*) The problem here, of course, lies in the language found in the first paragraph of section 11—6 which refers to a "special procedure" no longer found in the latter portion of the section. The continued presence of this language might be thought to preclude a holding that the legislature intended to abolish this organizational

distinction between the smaller and larger districts. That argument loses much of its force, however, in view of the fact that in none of the amendatory legislation considered by the General Assembly is there any other hint or suggestion as to the details or nature of any additional requirements applicable solely to proposed districts under 4,000 population. That clause referring to a "special procedure," which gives rise to the ambiguity under discussion, itself contains a number of changes made by Public Act 77–604, and it might also be argued that amendment of this clause indicates a legislative cognizance of its substance that prevents a finding of oversight. Closer consideration of the nature of these changes shows, however, that they are purely mechanical revisions apparently made throughout the Act to update its terminology (*i.e.,* "Schools of the county" to "educational service region"). We cannot conclude that such changes indicate any particular legislative intent to construct a new "special procedure", but, rather, we find that the language commencing with "if the special procedure later set forth in this Section" was inadvertently retained in the Act when, in fact, that procedure and the statutory distinction which it implemented had been abandoned.

Substantial authority exists to disregard words in a statute in order to effectuate legislative intent. (See generally Sutherland, Statutory Construction (3d ed. 1943) sec. 4926.) In construing an act providing the form of notice to be given of a public hearing by the board of local improvements, this court said: "Where a literal reading of a statute leads to an absurdity, plainly not intended, the courts will put such a construction upon the language used as corresponds with the plain meaning and intent of the legislature, and to effect that purpose will strike out words which are clearly superfluous." (*Gage v. City of Chicago (1903), 201 Ill. 93, 95.*) In that case, inartful drafting suggested that in addition to: (1) the substance of the resolution to be adopted, (2) the estimate

of the cost of the proposed improvement, and (3) the fact that the cost and character of the improvement might be changed by board action, the public notice was required to contain: "a statement that if, upon the hearing, the board should deem such improvement desirable, it should adopt a resolution therefor and prepare and submit an ordinance therefor as provided by the statute." A notice was held sufficient which did not contain the latter, since it complied with the clear intention of the statute, if not its literal wording.

In *People ex rel. Simpson v. Funkhouser (1944), 385 Ill. 396,* we avoided the mischief created by a literal reading of the School Law under which a county superintendent could have unilaterally determined whether a parcel of non-high-school territory would be included in a new community high-school district for which an election had already been lawfully called. There, an apparently unfettered power to annex territory to existing districts set forth in the statute was disregarded to the extent necessary to harmonize it with provisions for creating new school districts. We observed in *Funkhouser* that: "Where the enactment of a series of statutes results in confusion and consequences which the legislature may not have contemplated, the acts must be construed in such a way as to reflect the obvious intent of the legislature and permit the practical application of the statutes." 385 Ill. at 403.

The extent to which a legislative oversight may be judicially remedied is illustrated by the recent case of *People v. Clark (1972), 52 Ill.2d 374.* In that case, when the State's right to peremptory challenges had been omitted from the statute, we held that it was not error for a trial judge to allow such challenges despite the absence of statutory authority to do so.

We therefore conclude that the legislature sought in 1971 to eliminate procedural distinctions in the organization of districts of different populations and that the inadvertent retention of a reference to the former "special

procedure" based on such a distinction is a nullity. Section 11—6 of the School Code, in our opinion, is not unconstitutional because of vagueness, and we believe that subsequent enactments of section 11—6 without substantial change support this conclusion.

Accordingly, the judgment of the appellate court is reversed and the cause remanded to the circuit court of La Salle County for further proceedings not inconsistent with this opinion.

*Appellate court reversed; cause remanded.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. By its opinion the majority performs a statutory excision of proportions unprecedented in this jurisdiction and at the same time achieves a result contrary to the clearly demonstrated legislative intent. The magnitude of the deletion effected by the opinion is best demonstrated by setting forth the portions of section 11—6 which the opinion excises.

"~~Any contiguous and compact territory, no part of which is included within any community unit school district, or other unit district, having a population of not less than 4,000 and not more than 500,000 persons and an equalized assessed valuation of not less than $12,000,000 may be organized into a community unit school district as provided in this Article;~~ *** or any contiguous and compact territory, no part of which is included within any community unit school district or other unit district, having a population of not less than 1500 and not more than 500,000 persons and an equalized assessed valuation of not less than $10,000,000 may be organized into a community unit school district as provided in this Article, ~~if the special procedure later set forth in this Section for a district below 4,000 population is followed by the Superintendent of Public Instruction and the superintendent of an educational service region containing the greater percent of the assessed valuation of the proposed district than is contained in any other region in which assessed~~

valuation of the proposed district is situated." Ill. Rev. Stat., 1972 Supp., ch. 122, par. 11—6.

An examination of the development of the legislation governing the organization of community unit school districts demonstrates beyond question a legislative intent to eliminate small school districts and to encourage the organization of larger, stronger, economically sound districts, and in fact, from 1945 to 1957 the number of school districts in Illinois was reduced from 11,955 in 1945 to 4,951 in 1949 and to 1,849 in 1957. See Norman, "Legal Basis and Territorial Extent of School Districts," 1958 U. Ill. L.F. 327.

The legislation providing for the organization of community unit districts was first enacted in 1947 (Laws of 1947, p. 1530; Ill. Rev. Stat. 1947, ch. 122, pars. 8—9 through 8—14) and has been amended at each subsequent session of the General Assembly. (See Laws of 1949, p. 1392; Laws of 1949, p. 1446; Laws of 1951, p. 277; Laws of 1951, p. 602; Laws of 1953, p. 275; Laws of 1955, p. 1846; Laws of 1955, p. 2138; Laws of 1957, p. 2083; Laws of 1959, p. 2053; Laws of 1961, p. 1956; Laws of 1963, p. 3059; Laws of 1965, p. 220; Laws of 1965, p. 2652; Laws of 1967, p. 2771; Laws of 1967, p. 3472; Laws of 1968, p. 417; Laws of 1969, p. 2741; Laws of 1969, p. 2749; Laws of 1969, p. 3023; Laws of 1970, p. 505; Laws of 1971, p. 1217; Laws of 1971, p. 1225; Laws of 1972, p. 1966, Public Act 77—2744, effective October 1, 1972.) As originally enacted it provided a minimum population requirement of 2000 and an equalized assessed valuation of $6,000,000 and it was not until 1957 that the section was amended to permit the organization of districts with a population of not less than 1500, provided a special statutory procedure was followed. The special procedure to be followed was set forth in section 10—13 of the School Code (re-enacted in 1961 as section 12—4). It should be noted that while the statute continued to permit the organization of a district with a population of

not less than 2000 and an equalized assessed valuation of not less than $6,000,000, a district of less than 2000 population was required to have an equalized assessed valuation of not less than $10,000,000. In 1968 (Laws of 1968, p. 417) section 11—6 was amended to provide that organization of a community unit district required a minimum population of 4000 and an equalized assessed valuation of not less than $12,000,00 but the provision for the organization of a district with a minimum population of 1500 and an equalized assessed valuation of $10,000,00 upon compliance with the special procedure was retained.

Although section 12—4 was repealed in 1965 (Laws of 1965, p. 225) section 11—6 continued to refer to the repealed section until 1967 (see Ill. Rev. Stat. 1965, ch. 122, par. 11—6), when the special procedure provision was amended, as follows: "However, prior to calling any such election for organizing any such proposed district that does not have 2000 or more population, the county superintendent of schools shall transmit to the Superintendent of Public Instruction a notice of the petition ~~in the manner provided in section 12—4 for the organization of a community high school district~~, whereupon the Superintendent of Public Instruction shall prepare the notification or report ~~required by said section 12—4~~, indicating whether or not he deems it possible for the proposed district to provide a recognized school program for a 12-grade district under conditions set forth in said section. The county superintendent shall cause a copy of such report to be published as in said section provided." Laws of 1967, p. 2771.

The majority, after comparing P.A. 77—598 and P.A. 77—604, concludes that it was the legislative intent to make applicable to the organization of a community unit school district with a population of not less than 1500 and an equalized assessed valuation of not less than $10,000,000 the same procedures as govern the organization of a district of not less than 4000 population and an

equalized assessed valuation of not less than $12,000,000. The majority fails to explain why, if this were the legislative intent, the latter category was retained in P.A. 77—604 and re-enacted in 1972 (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 11—6). By its opinion, despite the explicit statutory requirement that a community unit district have a minimum population of 4000 and an equalized assessed valuation of $12,000,000, a provision not repugnant to or inconsistent with any other language in the statute, the majority makes applicable to all districts an ambiguous exception made for a 1500 minimum population, provided an unstated "special procedure" is followed. As a result, despite a legislative history which shows a trend toward more stringent minimum require- ments in order to encourage larger, stronger, economically sound school districts, the decision in this case will permit, without condition or exception, the organization of a unit school district with a population below that required for the creation of a high school district (Ill. Rev. Stat. 1971, ch. 122, par. 12—1) and equal to the minimum population requirement for the creation of a grade school district. (Ill. Rev. Stat. 1971, ch. 122, par. 11—1.) It is inconceivable that this was the legislative intent.

The majority justifies its action on the ground that "Substantial authority exists to disregard words in a statute in order to effectuate legislative intent." It relies on *Gage v. City of Chicago, 201 Ill. 93,* in which the court deleted from a statute the single word "that"; and *People ex rel. Simpson v. Funkhouser, 385 Ill. 396,* which is not in point. Prior to this case, the view which had prevailed on this court is expressed in *Niebling v. Town of Moline, 8 Ill.2d 11,* in which the court, in order to reconcile a repugnancy, was asked to delete six words from a statute. Noting that the reconciliation of the repugnancy would require the deletion of 26 words, the court said "In *Klein v. Department of Registration, 412 Ill. 75,* two meaning- less words were ignored by the court in construing the

constitutional validity of the act. We are reluctant, however, to ignore almost one-half of the second paragraph of the act in question under the guise of construing the act. We believe that such procedure would amount to performing the legislative function of drafting legislation rather than the judicial function of statutory construction." (8 Ill.2d 11, at 14-15.) Here the majority has excised a clearly stated statutory provision in order to give effect to an ambiguous provision which, without the excision, is vague and inconsistent, and has thereby lowered the minimum standards set by the General Assembly over a period of 26 years of amendatory legislation. I would hold that the provision for organization of a district of less than 4000 population and $12,000,000 equalized assessed valuation is vague, incomplete and invalid, and would affirm the judgment of the appellate court.

MR. JUSTICE KLUCZYNSKI joins in this dissent.